**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN M. HEAD,<br><br>    Plaintiff,<br><br>  v.<br><br>BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY; CHARLES B. REED, Chancellor, California State University; DON W. KASSING, Interim President, San Jose State University; SUSAN MEYERS, Dean, San Jose State University School of Education; CATHY M. BUELL, Department Chair, San Jose State University School of Education, Secondary Education Department and Associate Professor, San Jose University School of Education; HELEN MARY KRESS, Assistant Professor, San Jose State University School of Education; NATIONAL COUNCIL FOR ACCREDITATION OF TEACHER EDUCATION and DOES 1–100,<br><br>    Defendants.<br>                                         / | No. C 05-05328 WHA<br><br>**ORDER GRANTING MOTIONS TO DISMISS** |

**INTRODUCTION**

     In this action asserting violations of free-speech rights, all defendants move to dismiss the complaint for failure to state a claim. Plaintiff Stephen M. Head's complaint is merely a protest against teaching methods that, despite his objections, had a legitimate pedagogical goal. While he waves the First Amendment banner, it is only in an attempt to gag his professor's own free-speech rights. The motions are therefore **GRANTED**.

**STATEMENT**

Mr. Head's professor at San Jose State University, defendant Helen Mary Kress, criticized his stated positions on certain issues and encouraged him to adopt views with which he disagreed. He got an F in the course. Mr. Head stated emphatically at the hearing that he does not want to use this lawsuit to change the grade (as to which he is maintaining separate state court litigation). Rather, he seeks herein to challenge defendants' alleged compulsion of speech to which he objects. Mr. Head says he "holds generally libertarian or conservative beliefs" and is a Christian. He alleges that the teacher tried to compromise his beliefs by requiring him to espouse liberal views. As examples, he cites the course syllabus, which informed students that the class would teach them to "articulate rationales for . . . integrating . . . feminist education throughout the secondary education curriculum," and to "express sensitivity to the diversity . . . in California[] [and to] understand diversity as including . . . sexual orientation" (First Amend. Compl. ("Compl.") ¶¶ 19–20, 40, 104).[1]

In 2002, Mr. Head matriculated in the Secondary Education Department's Teacher Credential Program. In September 2003, he began taking a required course entitled Social, Philosophical [and] Multicultural Foundations of Secondary Education. It was taught by defendant Kress, an assistant professor (Compl. ¶¶ 28, 31, 33).

Her syllabus, distributed during the first class, included the "College of Education Vision," which stated that "the faculty is committed to preparing teachers . . . who are prepared to . . . promote equity, respect for person and social justice." The syllabus also included the Secondary Education Department Dispositions For Students, a set of professional behaviors and attitudes that the school expected students to achieve. These dispositions stated that "candidates are expected to demonstrate the following professional dispositions as they progress through course work . . . : [i]s intolerant of all forms of harassment, discrimination, and exploitation[.]" The syllabus also stated that "[b]y the end of the semester, students should

---

[1] A plaintiff's well-pleaded allegations of material facts must be taken as true and construed in the light most favorable to the plaintiff in considering a motion to dismiss. *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). The facts stated herein are therefore taken from the first amended complaint.

2

be able to: . . . discuss how to and why it is crucial to correct the current inequities in access to educational resources [and] . . . articulate rationales for and demonstrate excellence in integrating multicultural . . . education throughout the secondary education curriculum . . . ." Another handout included the following: "Societal Goals: Promote social structural equality and cultural pluralism (the United States as a 'tossed salad') . . . School Goals: Promote . . . cultural pluralism and alternative life styles . . . and support for power equity among groups." Professor Kress stated that the curriculum was required by defendant National Council for Accreditation of Teacher Education ("NCATE") (*id.* ¶¶ 35, 38–41).

During a break in the first class, Mr. Head stated that multiculturalism was "contested by many scholars and experts," and named some of them. Professor Kress allegedly responded by forbidding Mr. Head from citing those critics in class or classwork. Later, Mr. Head suggested to her that the rules governing classroom discussions should acknowledge students' right to disagree. Professor Kress did not write this suggestion onto the list of rules (*id.* ¶¶ 46, 49).

In another class, Professor Kress allegedly stated: "Vote no on Proposition 54," a California initiative that would have barred the state from using race, ethnicity, color or national origin to classify current or prospective students, contractors or employees. Later in that class, students discussed a video they had watched. The video showed "a group of racially differentiated men with differing viewpoints on discrimination discussing discrimination in . . . California." Mr. Head responded to the video by stating that immigrants to the United States are better off here than in other countries, due to a "comparatively better form of government." (It is unclear what connection, if any, this comment had with the video.) Professor Kress stated, "When I hear such opinions coming from someone, it makes me think that that person is unfit to teach" and that "all [her] colleagues in the Ed School would agree . . . ." In a later class session, Professor Kress allegedly told Mr. Head that it was "inadvisable" for him to write an assignment about a girl prevented from forming a "Caucasian Club" at her high school. Professor Kress told Mr. Head that she based her decision on the fact that "non-

3

1  Hispanic White Europeans comprise[] the 'dominant power structure' in U.S. society" (*id.* ¶¶
2  50–54, 56–57 (quotation marks and brackets in original)).

3  About mid-way through the semester, Professor Kress told Mr. Head that she had not
4  seen him "make progress on displaying" the Secondary Education Department Dispositions For
5  Students (*id.* ¶ 60, Exh. 2 (Email from Helen Kress, to "Steve" (Oct. 27, 2003))).

6  At a later class meeting, defendant Cathy M. Buell, the chair of the department, told Mr.
7  Head that local teachers unions would require teachers to adhere to the view of multiculturalism
8  taught in the San Jose State class.  Professors Buell and Kress told him that membership in
9  teachers unions was mandatory in California.  Professor Kress also told Mr. Head that students
10 would be graded on their moral views (*id.* ¶¶ 62–63).

11 Mr. Head attended all class sessions.  He turned in all work on time and "in good faith."
12 Professor Kress, however, initially refused to grade most of his work because she allegedly
13 "disagreed with the views, opinions, analysis or conclusions contained therein."  She required
14 him to revise his work to conform with here allegedly "radical political preferences, opinions,
15 and points of view."  He got grades of D or F on these assignments "[b]ecause the resubmitted
16 work still did not conform to Defendant Kress's worldview."  He got a D on the final
17 examination and an F for the course, although, again, this lawsuit does not challenge these
18 grades.  Professor Buell informed him that he failed.  Dean Susan Meyers also informed him of
19 it, via email.  In December 2004, the university's Student Fairness Committee denied Mr.
20 Head's appeal of his grade.  He has a pending state-court case challenging the grade (*id.* ¶¶ 65,
21 67–68, 71, 73, 75, 85, 93).

22 Defendant considered changing his major to special education.  In January 2005, he
23 enrolled in a class called Managing Behavior and Emotional Problems of Exceptional Children.
24 He turned in a writing assignment that "included philosophical points that Plaintiff held were
25 constructive alternatives to the existing public school special education pedagogical practice."
26 He received a grade of 10 points out of 15 on the assignment.  The only criticism by the
27 instructor that was written on the paper was "Specifics?"  Plaintiff suspected that the grading of
28

4

his assignment was discriminatory. He therefore sought and received approval to be dropped from the class (*id.* ¶¶ 86, 88–91).

On the basis of these facts, Mr. Head filed a first amended complaint, the contents of which are discussed in the analysis section below.

Defendants Board of Trustees of the California State University, Charles B. Reed, Don W. Kassing, Dean Meyers, Professor Buell and Professor Kress (collectively, the "University Defendants") move to dismiss the complaint for failure to state a claim. Defendant National Council for Accreditation of Teacher Education (NCATE) joins the University Defendants' motion and moves separately to dismiss for failure to state a claim. Mr. Head opposes the motions.[2]

**ANALYSIS**

A motion to dismiss a complaint for failure to state a claim can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). "All allegations of material fact [must be] taken as true and construed in the light most favorable" to the plaintiff. However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

Mr. Head is prosecuting this action in propria persona. The Court therefore will construe his complaint liberally. The ultimate issue presented is therefore whether it appears beyond doubt that Mr. Head can prove no set of facts in support of his claims which would entitle him to relief, even when his claims are liberally construed. *See Ortez v. Washington County, State of Or.*, 88 F.3d 804, 807 (9th Cir. 1996) (setting standard for motions to dismiss against *pro se* plaintiffs).

Mr. Head structures his complaint into three counts. The first is made under 42 U.S.C. 1983, and alleges that "Defendants violated Plaintiff's right to free speech guaranteed by the

---

[2] Plaintiff dismissed defendant Arthur Wise after the NCATE motion was made on his behalf (Notice of Voluntary Dismissal).

5

First and Fourteenth Amendments." The First Amendment is, of course, applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Mr. Head also alleges that defendants violated the Equal Protection Clause by discriminating against him "for his personal political views, analysis, religious beliefs, gender, sexual orientation, conclusions and opinions . . . ." By raising an equal-protection claim, he moves beyond the First Amendment to makes a claim that he was not afforded equal treatment due to his gender (male), sexual orientation (heterosexual) and other characteristics. He later broadens this claim further by alleging that defendants discriminated against him on the basis of his race. (Mr. Head "may appear White to others," although he has Native American ancestors.) He later also alleges that his right to due process of law was violated (Compl. ¶¶ 14, 104–105).

Mr. Head's "second claim" seeks declaratory relief. He seeks a declaration that San Jose State's "Mission, Vision, and Secondary Education Department Philosophy and/or Dispositions for Students," as well as similar documents for the Special Education Department, violate the First Amendment's prohibitions on establishment of religion and compulsion of speech. He also seeks a declaration that these documents "otherwise violate California statutory law, Constitution [sic] or the United States Constitution." He alleges such violations both facially and in the way the law was applied to him (*id.* ¶¶ 120–121).

This second claim's reference to violations of "the United States Constitution" must be read in conjunction with the first claim's allegations that defendants violated the Equal Protection Clause. It therefore suggests that Mr. Head seeks a declaration that defendants violated the Equal Protection Clause. The second claim's reference to violations of "California statutory law[] and] Constitution" must be read in conjunction with a section of the complaint labeled "Pertinent Laws & Rules," as well parts of the pleading that discuss his prior state-court proceedings. Those other sections involve Article I, Sections 2, 4 and 7(a) of the California Constitution, California Education Code Section 66301 and California Civil Code Sections 51 and 52. A liberal reading of the complaint therefore requires the conclusion that Mr. Head is

1  seeking a declaration that defendants also violated those state laws. Neither motion to dismiss
2  attacks any aspect of the claims based on state law.³

3  Mr. Head's "third claim" asserts two additional bases of liability. The first is the
4  Religious Freedom Restoration Act of 1993, which bars the federal government from
5  "substantially" burdening a person's "exercise of religion even if the burden results from a rule
6  of general applicability." 42 U.S.C. 2000bb-1. He also contends that defendants "wilfully
7  defrauded [him] of legitimate state and federal educational services" (Compl. ¶¶ 131–132).

### 1. BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY.

Defendant Board of Trustees of California State University argues that the complaint's allegations against the Board must be dismissed because 42 U.S.C. 1983 does not apply to states (Br. 4–5). The Board is correct. Section 1983 provides a cause of action only against "persons," a term which does not include states. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989). The Board of Trustees is an instrumentality of the state of California. *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006).⁴ The Board therefore cannot be sued under Section 1983.

### 2. DEFENDANTS REED, KASSING, MEYERS AND BUELL.

Defendants Reed, Kassing, Meyers and Buell argue that the claims against them must be dismissed because Mr. Head does not allege that they participated in actionable conduct (Br. 6). Mr. Head does not mention Chancellor Reed or University President Kassing in the complaint, other than to list their names and titles and to state that University President Kassing was "charged . . . with overseeing policies and procedures at the University in matters concerning student rights and privileges" (Compl. at caption & ¶¶ 5–6). He therefore makes no allegation that either man played any role in the alleged violations. Mr. Head nevertheless argues that he

---

³ Mr. Head also states in his second claim that he seeks a declaration that NCATE's "requirement that accredited institutions . . . assess 'dispositions' exceeds it's [sic] authority as approved by the U.S. Department of Education . . ." (Compl. ¶ 122). There is no reference in the complaint, however, to any statute or other authority violated by NCATE. This claim is therefore unintelligible and cannot, under even a liberal standard, assert a claim.

⁴ Mr. Head concedes as much by stating that the Board is "an agency of the California state government" (Compl. ¶ 12).

7

1  properly named them as defendants because "[e]ven after Plaintiff alerted higher ranking
2  officials in the University through his faculty complaints, University Officials refused to take
3  action to stop the abuses, and are thus responsible for failing to protect Plaintiff from the further
4  abridgement of his freedoms" (Opp. 8).  There is no allegation in the complaint, however, that
5  Mr. Head ever directed his complaints to Chancellor Reed or University President Kassing, or
6  that the two officials even knew about his situation.  Missteps in the complaint cannot be
7  rescued by argument in the briefs.  In any case, even if the argument in the opposition brief
8  were in the complaint, it would not state a claim against Reed or Kassing.  The allegations
9  against them therefore must be dismissed.

Mr. Head alleges that Professor Buell attended one session of the class.

> [She] commented to the class . . . that a primary theme of the cultural changes in the 1960s was concerned about [sic] ending discrimination towards women and minorities.  In response to a comment made politely by Plaintiff that the primary theme of the cultural changes in the 1960s included consciousness-raising for everyone, Defendant Buell responded that teachers will in any case be required by the local teacher's union to adhere to the view of multiculturalism as taught by the SJSU . . . .  Plaintiff responded . . . that the Supreme Court in *Chicago Teachers Union v. Hudson* . . . ruled that mandatory membership in a teachers' union was a violation of teachers' First Amendment rights, so that union membership was optional and union dictates in the classroom were irrelevant.  Defendants Buell and Kress both responded to Plaintiff by stating that union membership by [sic] public school districts in California was mandatory for teachers . . . .

Mr. Head also makes the conclusory allegation that a "hostile educational environment . . . was created by Defendant's [sic] Kress and Buell because Plaintiff took reasoned exception to some of the data and views offered in the course."  He also claims that he "requested several meetings with Defendants Kress and Buell and was repeatedly denied opportunities to discuss the issues raised in his faculty complaints.  The final mention of Professor Buell is that she "verbally informed [Mr. Head] that he got an 'F'" (Compl. ¶¶ 61–62, 66, 73).

Dean Meyers receives even less attention.  The only mention of her is that she sent him "an electronic mail notice of an 'F' grade in the class" (*id.* ¶ 75).

None of these allegations states a claim under Section 1983.  The alleged actions by Professor Buell and Dean Meyers do not reflect any effort to suppress or compel speech,

8

establish religion, inhibit Mr. Head's freedom of worship or discipline him for his speech. The allegation that Professor Buell created a "hostile educational environment" is purely conclusory and, even at that level of abstraction, does not state a legal conclusion that would entitle plaintiff to relief.

Mr. Head's only argument to the contrary is to cite to some of the above-quoted passages, and to one that states that "University College of Education faculty and/or staff" prejudged certain student beliefs, attitudes, philosophies, morality and ideology to be "acceptable." He then states that "higher ranking" university officials are liable because they did not "take action to stop the abuses" (Opp. 7–8). These arguments fail to point to anything in the complaint alleging conduct by Chancellor Kassing, University President Kassing, Dean Meyers or Professor Buell that would violate any of the provisions of law cited in the complaint. The claims against these individuals therefore must be dismissed.

### 3. PROFESSOR KRESS.

Professor Kress argues that Mr. Head's claim under the Religious Freedom Restoration Act of 1993, 42 U.S.C. 2000bb-1, should be dismissed (Br. 5). She is correct. The Act only provides for actions against the *federal* government, although it originally purported to cover state governments. 42 U.S.C. 2000bb-2(1). Congress, however, exceeded its authority by attempting to subject states to the strictures of the Act. *City of Boerne v. Flores*, 521 U.S. 507, 511 (1997). Congress later amended the statute so that only the federal government and the governments of the District of Columbia, the Commonwealth of Puerto Rico, and the other U.S. territories and possessions would be subject to liability. Religious Land Use and Institutionalized Persons Act of 2000, Pub. L. No. 106-274, § 7(a)(1), 114 Stat. 803, 806 (2000). Professor Kress is not alleged to have been anything more than a state-government employee. The complaint therefore fails to state a valid claim against her for violation of Section 2000bb-1.

Professor Kress seeks dismissal of the First Amendment claims on the ground that "[s]tudents generally may not use claims of religious freedom to avoid application of the University's curriculum" (Br. 5–6). In support of that contention, she cites *Axson-Flynn v.*

9

1   *Johnson*, 356 F.3d 1277 (10th Cir. 2004).  In *Axson-Flynn*, a state university required a student
2   in an acting class to use expletives in contravention of her religious convictions.  The court held
3   that the acting class was "school-sponsored" speech, meaning that the school affirmatively
4   promoted her speech and people "might reasonably perceive [it] to bear the imprimatur of the
5   school . . . ."  *Id.* at 1280, 1285.  In *Hazelwood School District v. Kuhlmeier*, the Supreme Court
6   had held that a public secondary school could regulate the content of such "school-sponsored"
7   speech so long as its actions are "reasonably related to legitimate pedagogical concerns."  The
8   court expressly reserved the issue of whether that same deferential standard would apply at the
9   college and university level.  484 U.S. 260, 273 & n.7 (1988).  The Tenth Circuit extended the
10  *Hazelwood* rule to college classrooms, so long as the speech occurs as part of a curriculum.  It
11  held, however, that the district court erred by granting summary judgment in favor of the
12  school, given that there was evidence that the school's academic justifications for requiring the
13  student to swear were pretexts masking religious bias.  356 F.3d at 1289, 1293.

14  Although our own circuit has not spoken with one voice on this issue, the Tenth
15  Circuit's formulation seems entirely correct to this Court.[5]  For example, if a student takes an
16  algebra course, the student cannot ace a quiz by offering biblical quotes.  Conversely, if he
17  takes a course on the Bible, he cannot answer exam questions by reference to mathematics.  The
18  student must learn the premises of the course and how to apply them.  *Learning* the premises
19  does not necessarily include *believing* in them.  Learning the course material in no way
20  compromises one's personal right to believe as he wishes.

21  Dismissal of the instant complaint is required in view of the Court's adoption of the rule
22  of *Axson-Flynn*.  The complaint fails to allege any facts that would support a conclusion that the
23  university's speech requirements were not reasonably related to legitimate pedagogical
24  concerns.  In fact, Mr. Head himself makes a variety of factual allegations that provide
25  pedagogical justifications for the methods used by San Jose State and Professor Kress.  For

---

[5] *Brown v. Li*, 308 F.3d 939 (9th Cir. 2002), although closely on point factually, includes no binding holding.  The three judges on the panel each filed their own opinions with quite distinct views about what First Amendment rules should be applied, if any.  There was thus "no majority opinion and no binding precedent with respect to any First Amendment principles."  *Id.* at 957 (Reinhardt, J., concurring in part and dissenting in part).

10

1   example, the school's "vision" stated that it wanted to foster "educators who can function
2   effectively and sensitively in the multicultural, multilingual . . . environment of today's
3   secondary schools" (Compl. ¶ 38).  Such statements indicate that the university was requiring
4   certain speech from students to improve their understanding of other races and cultures so that
5   they could better teach students in those groups.  That is a legitimate pedagogical purpose.

6   Furthermore, many of plaintiff's accusations do not state that *he* was compelled to say
7   anything.  Instead, they are complaints that the *professor* said something.  For example, she
8   stated that he was "unfit to teach" because of his reaction to the video on discrimination.  In
9   doing so, she was stating her opinion, not compelling him to speak or stifling any of his own
10  speech rights.  If a student has a right to speak freely, so does the teacher.  Furthermore, her
11  comment was pedagogically related to the goal of producing teachers who would know how to
12  educate students from a variety of backgrounds.  Rather than address the issue of
13  discrimination, plaintiff defended against a perceived attack on the United States by invoking
14  our form of government as an advantage over other countries.  In the context of plaintiff's
15  resistance to the rest of the lessons, it was reasonable and well within Professor Kress's
16  prerogative to tell him that he was not on track to be a qualified teacher.  Such negative
17  comments often are used to motivate students to perform better.  Plaintiff offers no reason to
18  think that this comment in any way infringed upon his rights or was unprotected by Professor
19  Kress's own free-speech rights.  Even when interpreted liberally, plaintiff's allegations fail to
20  state a First Amendment claim.

21  Mr. Head's other allegations do not suggest that defendants lacked a legitimate
22  pedagogical purpose.  He calls Professor Kress's ban on the use of sources critical of
23  multiculturalism "prejudicial, capricious and unprofessional."  He also claims that "Kress's
24  statements were an attempt to damage Plaintiff and were not pedagogical in nature or intent."
25  These comments are wholly conclusory.  He claims that Professor Kress asked him to redo
26  assignments "to conform with [her] . . . radical political preferences."  This requirement to redo
27  assignments was legitimately related to pedagogical goals.  Plaintiff also contends that his grade
28  was "unfounded and discriminatory," arbitrary, and "retaliatory in nature . . . for his expression

11

of disfavored political and personal views" (Compl. ¶¶ 48, 55, 67, 76). This final allegation was waived by his statement at the hearing that "this isn't about a grade" (Tr. of Proceedings at 22, Hearing on Mots. to Dismiss (Aug. 3, 2006)).

### 4. NCATE.

Mr. Head makes his claims against NCATE by asserting that it indirectly caused his injuries by requiring the university to establish "dispositions." In this context, NCATE defined dispositions as

> [t]he values, commitments, and professional ethics that influence behaviors toward students, families, colleagues, and communities and affect student learning, motivation, and development as well as the educator's own professional growth. Dispositions are guided by beliefs and attitudes related to values such as caring, fairness, honesty, responsibility, and social justice. For example, they might include a belief that all students can learn, a vision of high and challenging standards, or a commitment to a safe and supportive learning environment.

San Jose State created and adopted its own "dispositions" requirements. The Secondary Education Department stated, in its "Dispositions for Students," that "candidates [for teaching credentials] are expected to demonstrate the following professional dispositions as they progress through course work and field work experiences . . . ." Most of them are unrelated to Mr. Head's claims, such as "[p]ractices critical questioning," "[t]imeliness," and "[d]emonstrates ongoing commitment to professional development." Some, however, entered the territory that Mr. Head finds inhospitable, such as by requiring each student to show that he or she "[i]s intolerant of all forms of harassment, discrimination, and exploitation," and "[r]ecognizes the need for differences to ensure equal treatment for all . . . ." Professor Kress raised Mr. Head's purported failure to exhibit the school's required dispositions in an email to him. In the Special Education Department, in which Mr. Head began a class but later dropped it, the dispositions included a "commitment to ethical conduct, equity and social justice . . . . Candidates recognize and oppose [sic] social justice in themselves, their institutions and professional environments" (Compl. ¶¶ 22, 39, 60, 86, Exh. 2 (Email from Helen Kress); Wise Decl. ¶ 2, Exh. 1 (NCATE, Professional Standards for the Accreditation of Schools, Colleges, and Departments of Education 53 (2002))).

1    NCATE argues that Mr. Head fails to state a Section 1983 claim against it because all of
2 his claimed injuries were caused by the University Defendants, not NCATE. It argues that,
3 although it requires schools to set and enforce dispositions as a means for evaluating students, it
4 does not dictate the contents of the dispositions. It claims therefore that it did not proximately
5 cause Mr. Head's injuries (Br. 9–11).

6    It is the content of the dispositions, not their existence, which Mr. Head decries in his
7 complaint. By seeking to hold NCATE liable under Section 1983, he is essentially accusing it
8 of acting jointly with the state by requiring the state to set rules later used to infringe Mr.
9 Head's constitutional freedoms.

10   No one can be held liable under Section 1983 unless the plaintiff shows "that the
11 defendant personally participated in a deprivation of the plaintiff's rights, or caused such a
12 deprivation to occur." The causation requirement "is not satisfied by a showing of mere
13 causation in fact." Rather, the plaintiff must establish proximate or legal causation." Proximate
14 causation can be established by showing that the defendant set in motion a series of acts by
15 others which the defendant knew or reasonably should have known would cause others to inflict
16 a constitutional injury. *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (internal
17 citation omitted).

18   In *Arnold*, the issue was whether IBM was responsible for various constitutional injuries
19 suffered by a person who was arrested for stealing IBM trade secrets. The company initiated
20 and was involved intimately in operation of the government task force set up to capture the
21 thieves of the corporation's secrets. An IBM employee served on the task force. It even funded
22 much of the task force's operations. The task force searched the eventual plaintiff's home. In
23 doing so, it violated the Fourth Amendment. Despite IBM's deep involvement, the Ninth
24 Circuit held that summary judgment for the corporation had been proper. It based its decision
25 on the fact that the plaintiff had introduced no evidence suggesting that IBM exercised any
26 control over the task force's decision making, or that the police had relied on IBM's judgment
27 in deciding to arrest the eventual plaintiff. *Id.* 1354, 1356–58.

Because NCATE never had any contact with Mr. Head, it only can be held liable if (1) it set in motion an assault on Mr. Head's rights by Professor Kress *and* (2) knew or reasonably should have known that their actions would cause Professor Kress (or San Jose State University generally) to inflict constitutional injury.  In the instant case, there was no constitutional injury. There is therefore no way that NCATE could be liable for setting in motion events that led to Mr. Head's rights being violated.  Even if they had been violated, Mr. Head has failed to allege any facts from which it could be inferred that NCATE had reason to know that their "dispositions" requirement would lead others to violate his rights.  Mr. Head does not allege that NCATE required or influenced the School of Education to formulate its dispositions so that they would regulate speech.  He does not allege that NCATE should have known its actions would influence Professor Kress to violate Mr. Head's rights.

Instead, NCATE is accused of requiring the school to assess students "dispositions identified in its conceptual framework and in professional and state standards."  There is no way NCATE could have foreseen that a constitutional violation would flow from their requirement that schools assess those "values, commitments, and professional ethics" of students that might affect professional growth and "student learning, motivation, and development."  Mr. Head's allegations can be read to suggest that NCATE required schools to set their dispositions in accord with "values such as . . . social justice."  That formulation, however, in no way suggests that schools must do something that would violate the Constitution (Compl. ¶¶ 22, 27) (quoting from passages of NCATE's "Professional Standards"manual).  Finally, Mr. Head's alleges that "Defendants . . . acted . . . pursuant to the policies, customs, procedures, training, directions and teaching practices accepted, tolerated or condoned by Defendant[] TRUSTEES (*id.* ¶ 103). That accusation is far to vague and conclusory support his claims against dismissal.

Mr. Head has failed to allege that NCATE proximately caused the Section 1983 injuries of which he complaints.  The federal claims against it must therefore be dismissed.

**5.    EQUAL-PROTECTION AND OTHER CLAIMS.**

Plaintiff alleges bias claims based on gender, race, sexual orientation and other characteristics.  He alleges that his right to due process of law was violated.  He claims that he

14

was defrauded and that defendants violated several state-law provisions. He does not assert however, any facts that remotely support a claim of intentional discrimination based on his gender, race or sexual orientation. He pleads no facts related to procedural or substantive due process. He pleads no facts, much less with particularity, that go to the fraud allegation. The Court declines to exercise supplemental jurisdiction over his state claims. The complaint therefore is dismissed as to all of these claims as well.

## CONCLUSION

For the reasons stated, both motions to dismiss are **GRANTED**. Amendment of the complaint would be futile. The complaint is therefore **DISMISSED WITH PREJUDICE**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: August 14, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15